# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, solely in its capacity as Stockholders' Agent for the former shareholders and rightsholders of DineInFresh, Inc., | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **C.A. No. 2020-0710-JRS** |
| ALBERTSONS COMPANIES, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 2, 2021
Date Decided: June 7, 2021

John P. DiTomo, Esquire and Miranda N. Gilbert, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and John T. Ruskusky, Esquire and Lisa C. Sullivan, Esquire of Nixon Peabody, LLP, Chicago, Illinois, Attorneys for Plaintiff.

Thomas E. Hanson, Jr., Esquire of Barnes & Thornburg LLP, Wilmington, Delaware; Michael E. Swartz, Esquire and Taleah E. Jennings, Esquire of Schulte Roth & Zabel LLP, New York, New York; and Thomas P. DeFranco, Esquire of Schulte Roth & Zabel LLP, Washington, DC, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

Aggrieved former shareholders of DineInFresh, Inc. d/b/a Plated ("Plated") seek recovery of earnout consideration from Plated's acquirer, Defendant, Albertsons Companies, Inc., following a merger memorialized in an Agreement and Plan of Merger dated as of September 19, 2017 (the "Merger Agreement"). As is typical, the earnout consideration was contingent upon Plated reaching certain milestones post-closing. As is also typical, Albertsons bargained for the right to operate Plated post-closing in its discretion limited only by its express commitment not to operate Plated in a manner intended to avoid the obligation to pay the earnout. This was the parties' bargained-for allocation of risk with respect to Plated's future performance and the amount Albertsons would ultimately pay for the business.[1]

Plated has failed to reach any of the earnout milestones set forth in the Merger Agreement and Albertsons, therefore, has refused to make any earnout payments. The loss in merger consideration to Plated's former stockholders amounts to $125 million. Shareholder Representative Services ("SRS") brought this action on behalf of those shareholders to recover the earnout consideration on the ground that Albertsons operated Plated post-closing in a manner intended to miss the specified earnout milestones.

---

[1] Brian JM Quinn, *Putting Your Money Where Your Mouth Is: The Performance of Earnouts in Corporate Acquisitions*, 81 U. Cin. L. Rev. 127, 140–41 (2012) ("The earnout permits buyers to reduce the likelihood that they will overpay for a seller in the event the future turns out not to be as rosy as sellers predicted. Sellers bear the potential cost of their optimism.").

According to Plaintiff, throughout the course of negotiating the merger, Albertsons made numerous representations regarding plans for the operation of Plated's business post-closing, perhaps most importantly that Albertsons would continue to focus and grow Plated's proven e-commerce business, rather than pivoting Plated's operations to suit Albertsons' traditional grocery retail business. The parties eventually signed the Merger Agreement, which laid out the parameters of the earnout but, as noted, provided Albertsons sole and complete discretion over the operation of Plated post-closing. But, as noted, the Merger Agreement did prohibit Albertsons from taking any action with the *intent* of decreasing or avoiding the earnout. Post-closing, knowing that doing so would stall if not impair Plated's growth, Albertsons allegedly caused Plated to reduce its e-commerce operations and focus, instead, on establishing a presence within Albertsons' existing brick-and-mortar business, in direct contravention of what both parties understood would be necessary to meet the earnout milestones. According to Plaintiff, this misdirection was the cause of Plated's milestone misses.

Count I alleges that when Albertsons changed Plated's business model post-closing it breached the Merger Agreement by acting with an intent to avoid the earnout. Count I also alleges a breach of contract by Albertsons' failure to provide the required earnout statement for 2019. Relatedly, Count VI seeks specific performance of the contractual obligation to provide the earnout statement. Count

II alleges that Albertsons' pre- and post-closing conduct also breached the implied covenant of good faith and fair dealing. Count III alleges fraudulent inducement in that a number of Albertsons' oral representations pre-closing regarding the operation of Plated post-closing were false and, but for those representations, Plated would not have agreed to the earnout as structured.

Albertsons has moved to dismiss all counts under Court of Chancery Rule 12(b)(6). After carefully considering the Verified Complaint, I find it reasonably conceivable that Albertsons' decision to focus almost exclusively on Plated's brick-and-mortar business, despite having knowledge that such a decision would almost certainly cause the company to miss the earnout milestones, was the product of an intent to avoid the earnout in violation of Section 2.9(h)(vii) of the Merger Agreement. Counts II and III, however, must be dismissed. The implied covenant has no room to operate where a contract grants discretion to one party and then limits that discretion with an "intent" qualifier. That bargained-for contractual dynamic removes the need for the implied covenant. Plaintiff's fraudulent inducement claim fails for lack of justifiable reliance; the clear and unambiguous language of the Merger Agreement conflicts with each of the purported oral misrepresentations that Albertsons is alleged to have made pre-closing. Finally, to the extent Counts I and

3

VI seek to remedy Albertsons' failure to provide the earnout statement for 2019, this claim is dismissed as moot.[2]

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Complaint (the "Complaint") and documents incorporated by reference or integral to that pleading.[3] For purposes of the motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[4]

### A. Parties

Plaintiff, SRS, is a Colorado LLC.[5] Under the Merger Agreement, SRS is designated as the agent for former Plated stockholders and rightsholders to bring post-merger claims on behalf of those parties.[6]

---

[2] Plaintiff alleges, through Count I, that Albertsons breached Section 2.9(h)(ii) of the Merger Agreement by failing to provide the earnout statement for 2019. Count IV seeks a remedy of specific performance, requiring Albertsons to provide the statement. Albertsons has represented and Plaintiff does not dispute that the statement has since been provided. Accordingly, any demand that the earnout statement be produced must be dismissed because the claim is "no longer amenable to judicial resolution." *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del. 1997).

[3] Verified Compl. ("Compl.") (D.I. 1); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[4] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[5] Compl. ¶ 13.

[6] *Id.*

4

Defendant, Albertsons, is a Delaware corporation that operates the second-largest supermarket enterprise in the United States, owning and operating several chains including Albertsons, Safeway, Cons and Jewel-Osco.[7] Albertsons acquired Plated by merger in September 2017.[8]

## B. The History of Plated

Plated was "an e-commerce subscription meal kit delivery company" founded in 2012 by Joshua Hix, Elana Karp and Nick Taranto.[9] The business model, relatively novel for its time, involved consumers subscribing to Plated's services online in exchange for the receipt of packages delivered directly to their homes containing ingredients and recipes for home-cooked meals.[10] Plated enjoyed steady success over the course of its early operations. By July 2013, the company had delivered more than 100,000 meals to consumers through its online subscription service.[11] By the first quarter of 2017, Plated had delivered 450,000 meals in that

---

[7] Compl. ¶ 15.

[8] Compl. ¶ 6.

[9] Compl. ¶ 20.

[10] *Id.*

[11] Compl. ¶ 21.

quarter alone.[12]  This equated to a year-over-year first quarter revenue increase from $18.6 million in Q1 2016 to $31.6 million in Q1 2017.[13]

Along with impressive revenue numbers, Plated developed a sophisticated supply chain system with a focus on meal kit needs, data analytics, valuable technology and software.[14]  The technology, coupled with the technical expertise among its employees, made Plated an attractive target for potential acquirers.[15] While its founders were in the midst of deciding whether the company's impressive growth justified taking the company public, Albertsons contacted Plated in the spring of 2017 regarding a potential acquisition.[16]  Albertsons signed a letter of intent on July 21, 2017.[17]

### C. Pre-Closing Discussions Between Albertsons and Plated

As the parties negotiated a potential acquisition, Albertsons' executives made several comments regarding the future of Plated's e-commerce business and its plans for Plated upon acquisition.  One theme throughout the discussions was Albertsons'

---

[12] *Id.*

[13] Compl. ¶ 22.

[14] Compl. ¶ 23.

[15] *Id.*

[16] Compl. ¶¶ 24–25.

[17] Compl. ¶ 25.

professed belief that "e-commerce is the future."[18]  Albertsons told Plated that its management team recognized "that in order to compete, Albertsons needed to put data science at the core of its business, and Plated would enable it to do so."[19] Albertsons compared the future success of Plated with the "transformative acquisition" of jet.com by Wal-Mart, and represented to Messrs. Hix and Taranto, Plated's chief negotiators, that "together the companies would use digital to build a tighter relationship with their customers."[20]  With these synergies at the fore of the business plan, Albertsons' management team expressed its confidence to Plated that, post-acquisition, "Plated could easily achieve its projections for the next three years."[21]

Throughout August and September 2017, Albertsons repeatedly represented to Plated executives that it was "committed to growing Plated's business," looking forward to "gain[ing] market share in the meal kit market."[22]  These statements served as confirmation that Albertsons was prepared to commit substantial time, capital and other resources to grow Plated's existing e-commerce business

---

[18] Compl. ¶ 26.

[19] *Id.*

[20] Compl. ¶¶ 27–28.

[21] Compl. ¶ 29.

[22] Compl. ¶ 31.

platform.[23] In this regard, Albertsons assured Plated that its founders would be permitted to operate the e-commerce business as usual and in a decentralized fashion, while also pushing, in a phased process, in-store initiatives to grow Plated's business in the brick-and-mortar space.[24]

The arrangement was presented by Albertsons as a post-closing partnership between buyer and seller, with Plated running its business independently post-acquisition.[25] Part of this independence included Albertsons providing equity to key employees and allowing Plated's management to set compensation for employees in an effort to enhance key employee retention.[26] Albertsons made these statements out of an expressed recognition that "the company's management team and employees are critical to the success of the Transaction."[27] Moreover, Albertsons' negotiators touted the realities of economies of scale and lower transportation costs to help facilitate a smooth transition and increased revenue.[28]

---

[23] *Id.*

[24] Compl. ¶ 33.

[25] Compl. ¶ 35.

[26] Compl. ¶¶ 35–36.

[27] Compl. ¶ 36.

[28] Compl. ¶ 76.

Notwithstanding its sanguine tone during negotiations, Albertsons concealed from Plated that several members of Albertsons' senior management team were actually hostile to Plated's online subscription business.[29] Indeed, Albertsons' plan from the start was swiftly to build an in-store product line at the potential expense of the e-commerce business.[30]

## D. The Merger Agreement

Albertsons and Plated executed the Merger Agreement on September 19, 2017, whereby Plated was merged into a wholly owned subsidiary of Albertsons.[31] The Merger Agreement contemplated an upfront cash payment of $175 million,[32] to be followed by up to $125 million in earnout consideration payable over the next three years if certain earnout targets were met (the "Earnout").[33] Those targets were formulated based on Plated's past performance and forecasted growth.[34] According to Plaintiff, both parties understood that, if Plated continued on its then-current

---

[29] Compl. ¶ 40.

[30] Compl. ¶ 41.

[31] Compl. ¶¶ 6, 48; Def.'s Opening Br. in Supp. of Mot. to Dismiss Verified Compl. (D.I. 11) ("OB") Ex. A ("Merger Agreement").

[32] Merger Agreement § 2.9(a)–(g).

[33] Compl. ¶ 7; Merger Agreement § 2.9(h)(iii)–(v).

[34] Compl. ¶ 50.

trajectory, the Earnout targets would easily be satisfied.[35]  While the Earnout amount was to vary year-to-year, each year's Earnout thresholds were based on that year's "Net Revenue."[36]  And, "Net Revenue" is defined as "the consolidated gross revenue" of Plated "attributable to:"

> (i)  the sale of meal kits and all other products developed or prepared, in whole or in part, by the Company, whether in-store or via e-commerce,
> (ii)  the sale of products on a platform developed by the Company,
> (iii)  the sale of Products by the Purchaser Group using the "Plated" brand name or any other trademark of the Company, whether in-store of via e-commerce, or
> (iv)  advertising commissions, revenue sharing or slotting fees generated for in-box product placement or partnerships with the Company or a product or platform of the types described in clauses (i), (ii) or (iii),
> minus (b) all product returns, allowances, discounts, and sales, use, value-added and other direct Taxes to the extent billed and paid by the Purchaser Group, as determined in accordance with the Accounting Principles [and excluding revenue from inter-company transactions and equity investments].[37]

Importantly, the Merger Agreement also provides guidance on the role that Albertsons was to play in operating Plated post-acquisition.  Section 2.9(h)(vii) provides:

> Except as otherwise set forth in this clause (vii), [Albertsons] will have the exclusive right to make all business and operational decisions regarding [Albertsons] and its Subsidiaries (including [Plated]) in its

---

[35] *Id.*

[36] Merger Agreement § 2.9(h)(iii)–(v).

[37] Compl. ¶ 51; Merger Agreement, Ex. B.

sole and absolute discretion without regard to any other interest and will have no obligation to operate [Plated] in a manner to maximize achievement of the Earnout Issuance; provided, however, that [Albertsons] will not, and will cause its Affiliates not to, take any action (or omit to take any actions) with the intent of decreasing or avoiding any Earnout Issuance.[38]

Section 2.9 provides that Albertsons would provide an "Earnout Statement" to SRS for each year the Earnout was in play following execution of the Merger Agreement.[39]

### E. Albertsons' Post-Closing Actions and Plated's Failure to Reach Earnout Targets

Albertsons admitted, as demonstrated in internal documents from 2018, that Plated's success depended on "investment in the customer."[40] Albertsons further acknowledged that if Albertsons were to provide support, as it promised to do, Plated would easily achieve its Earnout targets.[41]

Notwithstanding these pre-closing profundities, shortly after closing, Shane Sampson, then the Chief Marketing Officer of Albertsons, informed Hix that Albertsons' management "never really cared about Plated's e-commerce

---

[38] Merger Agreement § 2.9(h)(vii).

[39] Compl. ¶ 53; Merger Agreement § 2.9(h)(ii).

[40] Compl. ¶ 70.

[41] *Id.*

11

business."[42]  Sampson advised Hix that he had been protecting Plated from the "sharks" at Albertsons who only cared about Plated's data science and the ways the acquisition could benefit Albertsons' already existing brick-and-mortar stores.[43] This revelation did not stand alone.  Albertsons' GVP of Merchandising Strategy Initiatives, Pat Brown, admitted to Hix that Albertsons' management team did not think much of e-commerce generally, much less Plated's subscription business specifically.[44]  Brown demonstrated his own aversion to the subscription business by failing to show up at meetings where Taranto was to present his proposals for Plated's future development of the e-commerce platform.[45]  The negative take on e-commerce ultimately was expressed from the top when, during a July 2018 meeting, Albertsons' CEO, Jim Donald, advised Plated employees that Albertsons had low expectations for e-commerce and it had no intention of competing with the top two players in the in-home grocery market.[46]

The day after closing, Albertsons immediately began to reallocate Plated's resources to get its product in approximately 1,000 of its stores within the span of

---

[42] Compl. ¶ 56.

[43] *Id.*

[44] Compl. ¶ 58.

[45] Compl. ¶ 60.

[46] Compl. ¶ 57.

one week.[47]  This was in line with Albertsons' hidden agenda to move Plated's brand away from the subscription service and "towards [an] omnichannel meal solution."[48] It is alleged that Albertsons initiated this dramatic strategic shift in Plated's business model in full recognition that the endeavor was infeasible given the complexity of Plated's supply chain.[49]

Plated altered its public messaging as well.  Specifically, Albertsons directed Plated's marketing team to focus on retail rather than e-commerce, despite its full understanding that shifting marketing and advertising from the subscription service would cause an immediate and significant impairment of revenue and customer growth.[50]  The shift immediately diverted substantial resources away from the e-commerce business, causing sales to suffer greatly.[51]  Albertsons made clear, starting nearly from day one post-acquisition, that in-store retail would become Plated's top, and at times only, priority.[52]

---

[47] Compl. ¶ 63.

[48] Compl. ¶ 71.

[49] Compl. ¶ 63.

[50] Compl. ¶¶ 72–73.

[51] Compl. ¶ 64.

[52] Compl. ¶ 75.

Beyond alleged misrepresentations regarding Albertsons' future focus and energy directed to growing Plated's proven success as an e-commerce leader, the Complaint alleges a host of other areas where Plated was purportedly misled.[53] *First*, Albertsons' promise of decreased transportation costs was empty and misguided. Despite Albertsons' apparently significant buying power, Plated's cost of goods sold increased and supply costs were not significantly lowered.[54] The transportation costs themselves were higher due to Albertsons' suppliers operating on the West Coast while the vast majority of Plated's customers were located on the East Coast.[55] Beyond the increased costs, the logistical dilemma associated with such difficult transportation issues led to a decrease in the quality of meal kits, an increase in customer complaints and an increase in the level of customers cancelling their subscriptions.[56]

*Second*, Plated was not provided "broad latitude" in running its business independently, particularly with respect to the hiring and compensation of certain employees. To start, Albertsons demanded that Hix hire Albertsons' Pat Brown as

---

[53] Compl. ¶¶ 76–89.

[54] Compl. ¶ 76.

[55] *Id.*

[56] Compl. ¶ 77.

COO of Plated.[57]  Then, Albertsons interfered with efforts to provide equity to certain employees, causing the resignation of key players, including Plated's Chief Data Science Officer, Haftan Eckholdt, and one of the company's co-founders, Taranto.[58]  Then, in January 2019, Hix flew to California to meet with Albertsons' executives in an attempt to preserve the fleeting value of Plated, only to be told that he should leave the company.[59]  After Hix was forced out, Albertsons chose to leave the CEO seat vacant.[60]  Albertsons also chose not to create a board of directors or even an advisory board for Plated.[61]

*Finally*, it is alleged that Albertsons badly mismanaged Plated, leading to a wholesale failure to meet Earnout targets and ultimately to the demise of the company.  Albertsons failed to take advantage of preferred pricing Plated had previously negotiated with vendors, refused to investigate potential methods to self-finance that would allow Plated to grow, and eventually announced it was closing the e-commerce subscription business altogether, despite significant revenue

---

[57] Compl. ¶¶ 78–79.

[58] Compl. ¶¶ 79–80.

[59] Compl. ¶ 82.

[60] Compl. ¶ 83.

[61] Compl. ¶ 84.

continuing to be generated from those operations.[62]  According to the Complaint, all of Albertsons' business decisions and obstructions post-acquisition ultimately led to a substantial decrease in Plated's revenue; and but for Albertsons' interference, Plated would have succeeded and at least a portion of the Earnout would have been paid.  Instead, Plated was decimated by Albertsons' deliberate sabotage and not a single Earnout target was met.

## II. ANALYSIS

The standard for deciding a Motion to Dismiss under Court of Chancery Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[63]

### A. Breach of Contract

In Count I, Plaintiff alleges Albertsons breached Section 2.9(h)(vii) of the Merger Agreement by taking actions with the intent of decreasing or avoiding payment of the Earnout.[64]  "To establish a breach of contract claim, a party must

---

[62] Compl. ¶ 85.

[63] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citation omitted).

[64] Compl. ¶ 94.

prove: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages that the plaintiff suffered as a result of the breach."[65] When construing contractual terms, "Delaware courts follow the objective theory of contracts, giving words their plain meaning unless it appears that the parties intended a special meaning."[66] In other words, "[u]nder Delaware law, which is more contractarian than that of many other states, parties' contractual choices are respected . . . ."[67]

"Intent" is "a well-understood concept," defined as "a design, resolve or determination with which persons act. Intent in the legal sense is purpose to use particular means to effect a certain result."[68] A defendant's intent can be inferred from well-pled allegations in a complaint, with the understanding that allegations of intent "need only be averred generally."[69] To plead a buyer's intent to avoid an

---

[65] *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013); *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997).

[66] *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *15 (Del. Ch. Feb. 27, 2020) (cleaned up).

[67] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011).

[68] *Lazard Tech. P'rs, LLC v. Qinetiq N. Am. Operations LLC*, 114 A.3d 193, 195 n.8 (Del. 2015); *Coverdale v. State*, 531 A.2d 1235 (Del. 1987) (Table) (same); *see also* BLACK'S LAW DICTIONARY (10th ed. 2014) ("[I]ntent is the mental resolution or determination to do [an act].").

[69] *Lyons Ins. Agency, Inc. v. Kirtley*, 2019 WL 1244605, at *4 (Del. Super. Ct. Mar. 18, 2019) ("Malice, intent, knowledge and other condition of mind need only be averred generally."); *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,

17

earnout, the goal of avoiding the earnout need not be "the buyer's sole intent"; rather, a plaintiff may well-plead that the buyer's actions were "motivated at least in part by that intention."[70] Albertsons argues the allegations in the Complaint are conclusory and fall far short of well-pleading that Albertsons acted with the intent to avoid the Earnout. I disagree.[71]

The Complaint alleges a scheme whereby, from the outset of negotiations between Albertsons and Plated until the closing of the merger, Albertsons deliberately hid from Plated's negotiators that it had no interest in Plated's e-commerce business and no intent to support it, much less grow it.[72] Indeed, according to the Complaint, Albertsons' management team was antagonistic toward

---

624 A.2d 1199, 1208 (Del. 1993) ("Intent and state of mind, on the other hand, may be averred generally because any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable." (cleaned up)).

[70] *Lazard*, 114 A.3d at 195.

[71] The two cases principally relied upon by Defendant are distinguishable for the simple reason that, in both cases, the complaint simply alleged that the buyers intended to avoid the earnout without pleading *any* facts to support that contention, circumstantially or otherwise. *See Tendyne Hldgs., Inc. v. Abbott Vascular, Inc.*, 2019 WL 2717857, at *2 (D. Del. June 28, 2019) ("The complaint . . . contains only conclusory assertions that Abbott breached the Agreement by failing to use Commercially Reasonable Efforts."); *Neurvana*, 2020 WL 949917, at *16 ("Plaintiff does not attempt to plead any such facts in even a conclusory fashion.").

[72] *See, e.g.*, Compl. ¶ 41 ("Albertsons' internal business plan from the start was based on immediately redirecting Plated's work to quickly build an in store product line—which would benefit Albertsons' brick and mortar operations but interfere with Plated's e-commerce growth and ability to achieve the Earnout.").

18

Plated's subscription business, with one executive admitting to one of Plated's founders post-closing that Albertsons "never really cared about Plated's e-commerce business."[73] Rather than push e-commerce, Albertsons sought to "cherry-pick other assets of Plated, including its data science expertise, for its own purposes" and change the business model entirely to focus on Albertsons' brick-and-mortar operations.[74] All of Albertsons' plans for Plated's business were wholly concealed throughout the negotiations, with Plated's representatives only finding out after the fact about Albertsons' true intentions.[75]

As Plaintiff readily acknowledged at oral argument, allegations that Albertsons intended to prioritize brick-and-mortar initiatives over e-commerce initiatives would not, alone, support a reasonable inference that Albertsons intended to avoid the Earnout. Plaintiff was also obliged to well-plead that Albertsons *knew* that pivoting from subscriptions to in-store sales would be unsuccessful in the short-term such that Plated would miss the Earnout milestones.[76] A review of the Complaint reveals that Plaintiff has done just that.

---

[73] Compl. ¶¶ 40, 56.

[74] Compl. ¶¶ 9, 10, 63.

[75] Compl. ¶¶ 39–40.

[76] *See S'holder Representative Servs. LLC v. Albertsons Co., Inc.*, C.A. 2020-0710-JRS, at 32 (Del. Ch. Mar. 3, 2021) (TRANSCRIPT) (D.I. 41).

Plaintiff alleges that the revenue targets triggering the Earnout "were based on Plated's past performance and forecasts, and, if Plated continued on its then-current trajectory, Plated . . . had a reasonable expectation that the revenue targets would be readily achieved."[77] Albertsons' internal documents reveal that it knew Plated's success depended on investment in the customer; it acknowledged that if it provided support to Plated's e-commerce business, the business would achieve +125% growth in 2018, well above the Earnout levels.[78] Nevertheless, immediately upon closing, Albertsons "directed that Plated drastically reallocate its resources to get a retail product into 1,000 stores in the span of one week."[79] Albertsons knew this endeavor was commercially unreasonable, creating a reasonable inference that it knew its push for in-store sales at the expense of subscriptions would cause Plated to fail to reach the Earnout targets.[80]

Albertsons also knew what was required to run a profitable e-commerce business, including the need to conduct targeted marketing, and yet it directed Plated's marketing team immediately to shift their focus from e-commerce to in-store retail, resulting in a decrease in subscriber count and corresponding decrease

---

[77] Compl. ¶ 50.

[78] Compl. ¶ 70.

[79] Compl. ¶ 63.

[80] *Id.*

in revenue.[81]  The reasonable inference allowed by these allegations is not that Albertsons sabotaged a company it just paid $175 million for, but rather that Albertsons intended to avoid short-term Earnout targets in favor of long term gains. Even if Albertsons took these actions only in part with the purpose of causing Plated to miss the Earnout milestones, this is enough at the pleading stage to support Plaintiff's breach of contract claim.[82]  That purpose is well-pled here.[83]

The Complaint's allegations with respect to Albertsons' intent track those addressed in *Windy City v. Teacher Insurance*,[84] where the court found the plaintiff's allegations allowed a reasonable inference that the defendant's actions were taken with an intent to reduce the earnout.  There, the plaintiff alleged the defendant, with

---

[81] Compl. ¶¶ 68, 71–72; *see also* Compl. ¶ 69 ("Plated had learned through experience that meal kit subscription revenue is connected to the expenditure of advertising dollars; in other words, Albertsons would have to spend advertising dollars to get new meal kit subscribers in the door. Plated shared this knowledge in the weeks leading up to the September 2017 Merger Agreement with Albertsons.").

[82] *Lazard*, 114 A.3d at 195.

[83] In this regard, Defendant's reliance on *Sharma v. TriZetto Corp.* is misplaced.  2016 WL 1238709, at *3 (D. Del. Mar. 29, 2016).  There, the court determined that complaint did not state a claim that the buyer intended to avoid an earnout where the plaintiff alleged the defendant "(1) fail[ed] to market the business; (2) chang[ed] management teams; and (3) fail[ed] to invest resources in operating the business." *Id.*  While these factual components make up part of the allegations here, the complaint in *Sharma* did not allege facts to support an inference that the defendant knew that its actions would result in the company missing the earnout targets and yet deliberately concealed the plans for those actions from the seller. That is what Plaintiff has alleged here.

[84] *Windy City Invs. Hldgs., LLC v. Tchrs. Ins. & Annuity Ass'n of Am.*, 2019 WL 2339932, at *10 (Del. Ch. May 31, 2019).

the intent to avoid an earnout, improperly divested certain aspects of the target's business without adjusting the earnout in accordance with contractual terms.[85] At or around the time of the divestment, the defendant's accountant "prepared a valuation report anticipating a reduction in the Earn-Out targets."[86] The seller alleged the buyer's post-closing actions were taken, "at least in part, with the purpose and intent of reducing the Earn-Out Amount."[87] Similarly, Plaintiff alleges that Albertsons knew that changing Plated's core business from e-commerce to brick-and-mortar would cause Plated to miss the Earnout milestones and yet chose to proceed in that direction regardless.[88] As in *Windy City*, it is reasonably conceivable that Albertsons' post-closing business initiatives were formulated "at least in part, with the purpose and intent of reducing the [Earnout]."[89]

Albertsons argues that Plaintiff's allegations cannot sustain a breach of contract claim when the conduct giving rise to the claim is expressly permitted under that same contract.[90] In doing so, Albertsons seizes upon its contractual allowance

---

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] Compl. ¶¶ 50, 63, 68, 70–72.

[89] *Windy City*, 2019 WL 2339932, at *10.

[90] Reply Br. in Supp. of Def. Albertsons Companies, Inc.'s Mot. to Dismiss the Verified Compl. (D.I. 17) at 5.

to operate Plated within its discretion while ignoring the contractual prohibition against operational decisions intended to avoid or reduce the Earnout. Because Plaintiff's well-pled allegations make it at least reasonably conceivable that Albertsons acted with the intent to avoid or reduce the Earnout, it cannot be said, as a matter of law, that Albertsons' conduct was expressly permitted.

Albertsons finally argues that it is "difficult to define in the abstract" what "bad faith" looks like when a buyer is granted "sole discretion" to operate the business in any way it sees fit post-closing.[91] That is true enough. Albertsons negotiated for a wide berth in its operation of Plated after closing. But it also promised not to operate Plated in a manner intended to cause it to miss the Earnout milestones. And yet the Complaint well-pleads that Albertsons told Plated it would follow Plated's e-commerce business plan when it had no intention of doing so, knew that business plan was the only way to achieve the Earnout and then deliberately ignored the plan from the outset knowing that decision would cause Plated to miss the Earnout milestones.[92] A reasonable inference from these allegations is that Albertsons altered Plated's business plan, at least in part, as a means and with the intent to avoid paying the Earnout.

---

[91] *ev3, Inc. v. Lesh*, 114 A.3d 527, 540 (Del. 2014).

[92] Compl. ¶¶ 9–10, 26, 28–29, 31, 36, 42, 50, 56, 63, 68, 70–72.

## B. The Implied Covenant of Good Faith and Fair Dealing

"Under Delaware law, the implied covenant of good faith and fair dealing inheres in every contract."[93]  To state a claim for breach of the implied covenant, "a complaint 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'"[94]  It has become routine in Delaware to observe that application of the implied covenant involves "a cautious enterprise" in recognition that "it is a limited and extraordinary legal remedy and not an equitable remedy for rebalancing economic interests that could have been anticipated."[95]  In other words, the implied covenant will not serve as a

---

[93] *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009).

[94] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020) (quoting *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009)).

[95] *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021) (internal quotations omitted) (citing cases); *see also Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (noting the implied covenant may be used only "to handle developments or contractual gaps that the asserting party pleads neither party anticipated"); *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636–37 (Del. Ch. 2011) ("[A] party may only invoke the protections of the covenant when it is clear from the underlying contract that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." (internal quotations omitted)); *Clean Harbors, Inc. v. Safety-Kleen, Inc.*, 2011 WL 6793718, at *9 (Del. Ch. Dec. 9, 2011) ("[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." (internal quotations omitted)).

means to provide contractual protections that parties "failed to secure for themselves at the bargaining table."[96]

Section 2.9(h)(vii) of the Merger Agreement elucidates an understanding from both sides that the operation of the business, post-closing, would be under the exclusive control of Albertsons and Albertsons alone.[97] To the extent Plated's management wished to maintain specific levels of operational control, Plated could and should have bargained for those rights.[98] Instead, the only limitation Plated bargained for was that Albertsons could not act "with the intent of decreasing or avoiding any Earnout."[99] At bottom, when a contract provides the buyer sole discretion over business decisions subject to very limited contractual exceptions, the

---

[96] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004); *see also Nemec*, 991 A.2d at 1126 ("When conducting [an implied covenant] analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.").

[97] Merger Agreement § 2.9(h)(vii) ("[Albertsons] will have the exclusive right to make all business and operational decisions . . . .").

[98] *Aspen Advisors LLC*, 861 A.2d at 1260; *Sheth v. Harland Fin. Sols., Inc.*, 2014 WL 4783017, at *5 (Del. Super. Ct. Aug. 28, 2014) ("What is concerning to the Court is that Plaintiffs' good faith and fair dealing claim appears to be an attempt to broaden the contractual language agreed to by these sophisticated parties and is asking the Court to imply additional duties and obligations beyond that contained in the 78-page, single-spaced agreement.").

[99] Merger Agreement § 2.9(h)(vii).

court will not override those bargained for provisions by giving the implied covenant independent force to bolster earnout protections for the seller.[100]

Plaintiff argues that when the buyer is granted "absolute discretion," the "discretion-exercising party" must make all decisions in good faith.[101] That is an accurate statement of our law, as far as it goes.[102] But where the parties themselves bargain for limits on the buyer's discretion, as here, there is no gap for the implied covenant to fill.[103] In *Lazard v. Qinetiq*, our Supreme Court addressed a nearly

---

[100] *Lazard*, 114 A.3d at 196 ("Section 5.4 specifically addressed the requirements for an earn-out payment and left the buyer free to conduct its business post-closing in any way it chose so long as it did not act with the intent to reduce or limit the earn-out payment."); *see also Reardon v. Canarchy Holdco Corp.*, C.A. No. N12-12-016 AML CLLD, at ¶¶ 9–11 (Del. Super. Ct. June 4, 2021) (ORDER) (dismissing plaintiff's implied covenant claim in support of an earnout upon concluding that a merger agreement's scheme of granting buyer discretion to operate the business post-closing so long as it does not do so with an intent to avoid the earnout left no gaps for the implied covenant to fill).

[101] Answering Br. in Opp. to Def. Albertsons Companies, Inc.'s Mot. to Dismiss the Verified Compl. (D.I. 13) ("AB") at 24; *Amirsaleh*, 2008 WL 4182998, at *1 ("[T]he law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith."); *Neurvana*, 2020 WL 949917, at *20 ("[V]esting [a contracting party] with discretion does not relieve [the party] of its obligation to use that discretion constituently with the implied covenant of good faith and fair dealing." (alteration in original)).

[102] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 147 (Del. Ch. 2009); *Amirsaleh*, 2008 WL 4182998, at *8 ("Simply put, the implied covenant requires that the 'discretion-exercising party' make that decision in good faith."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) ("[I]f one party is given discretion in determining whether the condition in fact has occurred that party must use good faith in making that determination.").

[103] *Lazard*, 114 A.3d at 196.

identical circumstance where the seller sought to invoke the implied covenant in the face of a contractual provision that expressly "left the buyer free to conduct its business post-closing in any way it chose so long as it did not act with the intent to reduce or limit the earn-out payment."[104] The Court held "that the implied covenant did not inhibit the buyer's conduct" because the parties' bargained-for limitation on the exercise of the buyer's discretion left no room for the implied covenant.[105] That same result is required here.

Plaintiff next argues that because Plated's "reasonable expectations were frustrated" by Albertsons, the implied covenant must operate as the vehicle by which those frustrated expectations can be realized.[106] Even setting aside the fact that the

---

[104] *Id.*

[105] *Id.* While I recognize that *Lazard* was decided in the context of a post-trial appeal, the Court's expressed view that the lower court "was very generous in assuming that the implied covenant of good faith and fair dealing operated at all" supports the notion that, even on a motion to dismiss, an implied covenant claim is not viable in the context of express contractual provisions cabining a buyer's discretion. *Id.*; *accord Reardon,* C.A. No. N12-12-016 AML CLLD, at ¶¶ 9–11 (dismissing implied covenant claim under identical circumstances under Rule 12(b)(6)).

[106] *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *6 (Del. Ch. Jan. 29, 2015) ("[A] claim for violation of the implied covenant of good faith and fair dealing can survive if, notwithstanding contractual language on point, the defendant failed to uphold the plaintiff's reasonable expectations under that provision."). There is, of course, a distinction between frustration of purpose and trampling over bargained-for contractual language. Our courts will allow the implied covenant to remedy the former, but not to facilitate the latter. *See, e.g., Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) ("The implied covenant is available only where the terms to be implied are missing from the contract; it cannot be invoked to override the express terms of a contract. Thus, if the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not

Merger Agreement fully occupies the space with respect to the buyer's post-closing operation of the business,[107] as a matter of law, Plaintiff's alleged "expectations" were unreasonable. According to Plaintiff, the realization of the Earnout itself is the "expectation," and Albertsons' failure to achieve the Earnout is the kind of "frustration" the implied covenant is meant to remedy.[108] That view of contingent consideration ignores the risk allocation that animates an earnout; parties anticipate (or should anticipate) at the time of contracting that earnouts might be paid or they might not be paid.[109] In the case of the Merger Agreement, Plated bargained for a provision that prevented Albertsons from intentionally scuttling the Earnout. That was the bargained-for means by which Plated managed the risk of non-payment. Its shareholders are now enforcing that right, and at least for now, that claim has

---

viable." (internal quotations omitted)); *3M Co. v. Neology, Inc.*, 2019 WL 2714832, at *11 (Del. Super. Ct. June 28, 2019) ("[*Renco*] is inconsistent with other Delaware cases defining the pleading requirements of implied covenant claims.").

[107] *Edinburgh*, 2018 WL 2727542, at *9 (holding that the implied covenant cannot "override" bargained-for contractual rights and obligations).

[108] AB at 22; Compl. ¶ 29.

[109] *Neurvana*, 2020 WL 949917, at *1 ("In an effort to allocate the risk associated with the device, the parties agreed to a post-closing earn-out structure."); *see also* John D. Cromie, *A Practical Guide to Structuring Earn-Outs in Merger and Acquisition Transactions*, 2013 WL 7121054, at *3 (Aspatore) (Dec. 2013) ("[A] well-drawn earn-out provision can allocate risk among the parties to a transaction and bridge the immediate financial and valuation uncertainty posed by these factors.").

survived dismissal.  Again, there is no gap for the implied covenant to fill, and no

expectation that cannot be realized by enforcement of the parties' contract.[110]

## C. Fraudulent Inducement

To state a claim for fraud or fraudulent inducement a plaintiff must well plead

the following elements:

> (1) a false representation, usually one of fact, made by the defendant;
> (2) the defendant's knowledge or belief that the representation was
> false, or was made with reckless indifference to the truth; (3) an intent
> to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's
> action or inaction taken in justifiable reliance upon the representation;
> and (5) damage to the plaintiff as a result of such reliance.[111]

The first element of fraud, a "false representation" can take several forms, including:

an "overt misrepresentation (*i.e.* a lie), a deliberate concealment of material facts, or

else silence in the face of a duty to speak."[112]  Plaintiff alleges all three varieties here.

Ultimately, each of Plaintiff's fraud allegations fails as a matter of law for the

same reason: a lack of well pled justifiable reliance.  "[W]hether a party's reliance

---

[110] *Winshall*, 55 A.3d at 636–37 (holding the court cannot allow a plaintiff to employ the implied covenant in order to "rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal").

[111] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018) (citing *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999)); *Abry P'rs V, L.P. v. F & W Acqs. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[112] *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 (Del. Ch. Apr. 3, 2020) (cleaned up).

was reasonable is not generally suitable for resolution on a motion to dismiss."[113] With that said, Delaware courts have found a lack of justifiable reliance at the pleading stage when the dispute involves alleged prior misrepresentations or omissions that run expressly counter to the terms of a fully integrated contract.[114]

The Complaint alleges a constellation of alleged oral misrepresentations made during negotiations, including that Albertsons promised to give Plated the tools and resources to further scale their operations,[115] provide equity to retain key employees,[116] give the Plated management team broad latitude in setting compensation,[117] and prioritize Plated's e-commerce subscription business over in-store meal kits.[118] The Complaint further alleges that Albertsons concealed its true motive to prioritize Plated's role in Albertsons' existing brick-and-mortar business

---

[113] *TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726, at *7 (Del. Super. Ct. Sept. 25, 2015).

[114] *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *7–9 (Del. Ch. Sept. 22, 2016); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *14 (Del. Ch. Dec. 30, 2010); *DeBakey Corp. v. Raytheon Serv. Co.*, 2000 WL 1273317, at *22 (Del. Ch. Aug. 25, 2000).

[115] Compl. ¶ 33.

[116] Compl. ¶ 35.

[117] Compl. ¶ 36.

[118] Compl. ¶¶ 5, 26, 30, 32, 45.

at the expense of e-commerce.[119]   According to Plaintiff, had Plated known of Albertsons' true intentions, it would not have executed the Merger Agreement, at least not without insisting on substantial revisions to the Earnout provisions.[120] Taking the alleged oral misrepresentations as true, the question is whether, given the existence of contractual language to the contrary, Plated was justified in relying on Albertsons' misrepresentations. In my view, the answer is no.[121]

Albertsons asserts that the Merger Agreement was a fully integrated contract between two sophisticated parties, making Plaintiff's reliance on any prior oral representation as a basis for a fraud claim unreasonable.[122]   Defendant cites to the Merger Agreement's integration clause at Section 11.4, which reads, in relevant part: "This Agreement . . . and other agreements specifically referred to herein . . .

---

[119] Compl. ¶¶ 39–40, 42, 46.

[120] Compl. ¶¶ 5, 109.

[121] To be clear, justifiable reliance is what makes Plaintiff's fraud claim distinguishable from its breach of contract claim. As already discussed, Albertsons promised in the Merger Agreement that it would not intentionally take actions or fail to take actions "with the intent of decreasing or avoiding any Earnout Issuance." Merger Agreement § 2.9(h)(vii). Plaintiff has appropriately pointed to certain discussions between the negotiators pre-closing as circumstantial evidence that Albertsons knew that certain actions or omissions post-closing would place achievement of the Earnout in jeopardy. As discussed below, that is different from pointing to alleged false future promises from Albertsons, contradicted by or not stated in the integrated contract, as support for a claim that Plated justifiably relied upon those promises as binding such that the failure to perform them constitutes actionable fraud. For reasons stated below, if there is a claim here, it is for breach of contract, not fraud.

[122] OB at 20.

31

constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof."[123]

Importantly, the Merger Agreement's integration clause lacks anti-reliance language explicitly providing "that a party is not relying on any extra-contractual representations."[124] And, our law is now settled that "[t]he presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on *facts* outside the contract, will not suffice to bar fraud claims."[125] Thus, if the allegation here was that Plated relied upon intentionally false extra-contractual statements of fact, the integration clause would not bar the claim.[126] But that is not what Plaintiff has alleged, and the distinction matters.

The gravamen of Plaintiff's fraudulent inducement claim is that Albertsons lied about its "future intent" with respect to the operation of the business post-

---

[123] Merger Agreement § 11.4.

[124] *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *22 (Del. Ch. Sept. 30, 2014).

[125] *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004) (emphasis supplied).

[126] *Id.*; *Black Horse*, 2014 WL 5025926, at *22–23.

closing.[127] While anti-reliance language is needed to stand as a contractual bar to an extra-contractual fraud claim based on factual misrepresentations,[128] an integration clause alone is sufficient to bar a fraud claim based on expressions of future intent or future promises.[129]

This distinction was on full display in *Black Horse*, where the plaintiff alleged that, prior to signing an acquisition agreement, the parties orally agreed that the plaintiff would be given the opportunity to make a $10 million bridge loan to defendant post-closing in exchange for an increased percentage of the target entity.[130] Yet, the oral agreement never made it into the written contract.[131] When the defendant refused to commit to the bridge loan post-closing, the plaintiff sued for fraud. The court dismissed the claim, holding that an extra-contractual fraud claim based on a "future promise" cannot stand when the parties committed "in a

---

[127] Compl. ¶¶ 30, 33, 35, 36; *see Black Horse*, 2014 WL 5025926, at *24 (noting a distinction between inducement claims based on statements of present fact and claims based on "future intent"); *Kronenberg*, 872 A.2d at 585–86 (addressing claim that defendant made factual representations regarding a purported third-party feasibility study that was actually fabricated by defendant); *Abry P'rs*, 891 A.2d at 1051 ("[T]he Buyer has alleged, with specificity, precisely what financial statements were materially false and why they were false.").

[128] *Kronenberg*, 872 A.2d at 590–92.

[129] *Black Horse*, 2014 WL 5025926, at *24.

[130] *Id.*

[131] *Id.*

33

clear integration clause . . . that [they] will not rely on promises and representations outside of the agreement . . . ."[132] To hold otherwise, the court noted, would allow the party claiming fraud to "shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim."[133] As distinguished from a claim of extra-contractual fraud based on a statement of fact, the fraud claim based on a "future promise" amounts to an improper attempt to introduce "parol evidence that would vary the extant terms in the subsequent integrated writings."[134] That is precisely what Plaintiff would have the Court do here.

The plain terms of the Merger Agreement contradict the alleged misrepresentations on which Plated claims it relied. To reiterate, Section 2.9(h)(vii) provides "[Albertsons] will have the exclusive right to make all business and operational decisions regarding [Albertsons] and its Subsidiaries (including [Plated]) in its sole and absolute discretion."[135] The only contractual limitation to such discretion requires that Albertsons not take any action "with the intent of decreasing or avoiding" the Earnout.[136] Despite this far-reaching contractual

---

[132] *Id.*

[133] *Id.* (quoting *Abry P'rs*, 891 A.2d at 1057).

[134] *Id*.

[135] Merger Agreement § 2.9(h)(vii).

[136] *Id.*

discretion, Plaintiff's allegations of fraud are centered on certain "business and operational decisions" Albertsons implemented post-closing that were purportedly inconsistent with promises made during negotiations.[137] As this court has noted:

> Delaware is a contractarian state. As such, a party who enters into a contract governed by Delaware law will be charged with knowledge of the contents of the instrument and will be deemed to have knowingly agreed to the plain terms of the instrument absent some well-pled reason to infer otherwise. And this same party will face an uphill climb when it seeks to prosecute claims that it relied on promises that are explicitly contradicted by its own clear and unambiguous written contract. These bedrocks of Delaware law apply in full force here.[138]

If Plated wanted contractual commitments from Albertsons that it would operate Plated in a particular manner post-closing, Plated could and should have bargained for those commitments as carve-outs to the broad discretion it otherwise agreed to give to Albertsons.[139] Having failed to secure those commitments in a fully integrated contract, it cannot now claim fraud as a basis "to avoid the deal it made

---

[137] Compl. ¶¶ 5, 26, 30, 32, 33, 35, 36, 45.

[138] *Chapter 7 Tr. Constantino Flores*, 2016 WL 5243950, at *6.

[139] *See Debakey Corp.*, 2000 WL 1273317, at *22 (rejecting a fraud claim based on extra-contractual representations that the buyer would inject additional capital into the acquired business post-closing after a contractually pre-set spending limit was reached because the operative contract "expressly and unambiguously permitted RSC to terminate the Agreement 'in its sole discretion' once the $2 million limit was reached"); *Kronenberg*, 872 A.2d at 593 n.46 (recognizing that the outcome might be different if the alleged prior oral misrepresentations "contradict or vary any express term of the written agreement"); *Carrow v. Arnold*, 2006 WL 3289582, at *11 (Del. Ch. Oct. 31, 2006) ("It is unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement.").

in favor of the deal it now wishes it made."[140]  Plaintiff bargained for Albertsons not to intentionally scuttle the Earnout.  It may attempt to prove a breach of that contractual obligation but cannot claim fraud based on future promises not memorialized in the Merger Agreement.[141]

## III.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Count I is DENIED to the extent it alleges a breach of Section 2.9(h)(vii) of the Merger Agreement. Defendant's Motion to Dismiss Counts II–IV, as well as the portion of Count I alleging breach of Section 2.9(h)(ii) of the Merger Agreement, is GRANTED.

**IT IS SO ORDERED.**

---

[140] *Chapter 7 Tr. Constantino Flores*, 2016 WL 5243950, at *9.

[141] In apparent recognition that the Merger Agreement confounds its fraud claim, Plaintiff contends that its reasonable reliance upon Albertsons' pre-closing representations that it would prioritize e-commerce over brick-and-mortar was encouraged by several provisions in the Merger Agreement that indicate Albertsons intended to operate Plated as a subscription business post-closing.  *See* AB at 37; Merger Agreement Art. I (defining "Business" as "(a) [Plated's] current business of sourcing, designing, advertising, marketing, preparation, handling, shipping and delivery of cook-at-home meal kits, and (b) any other businesses currently conducted by [Plated]"); § 8.3(l) (defining "Key Employee" to include the Chief Data Science Officer and the Chief Technology Officer); § 2.6(b) (permitting Plated's officers to stay on at the company until their resignation or removal); §§ 6.3–6.4 (requiring Plated to operate in the ordinary course of business pre-closing).  The effort misses the mark for the simple reason that, contrary to Plaintiff's suggestion, none of these provisions state or even suggest that e-commerce was to be Albertsons' only or even primary focus post-closing.